## TOLEDO S. S. CO. v. ZENITH TRANSP. CO.

(Circuit Court of Appeals, Sixth Circuit. January 27, 1911.)

No. 2,058.

**1. ADMIRALTY (§ 1*)—NATURE OF JURISDICTION—RULES OF DECISION.**

A court of admiralty is not bound by the rigid rules of the common law, but deals with causes on equitable principles and according to the rules of natural justice.

[Ed. Note.—For other cases, see Admiralty, Cent. Dig. § 2; Dec. Dig. § 1.*]

**2. ARBITRATION AND AWARD (§ 16*) — SUBMISSION OF ADMIRALTY CAUSE — RIGHT TO REVOKE.**

Two steamships were in collision, and to avoid going into court the respective owners entered into an agreement for arbitration, which provided that the arbitrators should proceed in accordance with the course and practice of such causes in admiralty and should first determine the question of fault for the collision, and if counsel for the parties could not then agree on the damages the arbitrators should determine the same; the award, concurred in by two of the three, to be binding. After full hearing and argument of counsel, a decision was rendered, concurred in by two of the arbitrators, finding one of the vessels solely in fault. whereupon the defeated party gave notice that it revoked the submission to arbitration, and its counsel and the arbitrator selected by it refused to further participate, and an award of damages was thereafter made against it by the two remaining arbitrators after due notice. The arbitrators were all lawyers of standing learned in the admiralty law, and the good faith of the proceeding was not questioned. *Held*, that the defeated party would not be permitted to repudiate the arbitration under such circumstances and to maintain a suit in a court of admiralty to have the other party adjudged in fault and held liable for the collision.

[Ed. Note.—For other cases, see Arbitration and Award, Cent. Dig. § 64; Dec Dig. § 16.*]

**3. ARBITRATION AND AWARD (§ 16*)—SUBMISSION—RIGHT TO REVOKE.**

The decision by the arbitrators of the question of fault and liability for the collision was final as to the principal question and the only one of a judicial nature submitted, and after its publication neither party could, even under the technical rules of the common law, revoke the submission as to the matter of damages which was not strictly an arbitration but merely an appraisement to follow the determination of the question of liability; that being the only one in dispute when the agreement was made.

[Ed. Note.—For other cases, see Arbitration and Award, Dec. Dig. § 16.*]

**4. ARBITRATION AND AWARD (§ 3*)—NATURE OF PROCEEDING—MATTERS SUBJECT TO "ARBITRATION."**

To constitute an arbitration, the matter submitted must be one in dispute between the parties, and not some matter which it is expected may arise between them or a matter of accounting or appraisal.

[Ed. Note.—For other cases, see Arbitration and Award, Cent. Dig. § 12; Dec. Dig. § 3.*

For other definitions, see Words and Phrases, vol. 1, pp. 487–489.]

**5. ARBITRATION AND AWARD (§ 35*)—AWARD—AWARD BY LESS THAN FULL NUMBER OF ARBITRATORS.**

Where an agreement for arbitration by three arbitrators provided for an award by two, the fact that one refused to sign the award or to

participate in a further ascertainment of damages which the submission required did not invalidate the award nor the subsequent proceeding for ascertaining damages.

[Ed. Note.—For other cases, see Arbitration and Award, Cent. Dig. §§ 189, 190; Dec. Dig. § 35.*]

Appeal from the District Court of the United States for the Western District of Michigan.

Suit in admiralty by the Toledo Steamship Company against the Zenith Transportation Company. Decree for respondent, and libelant appeals. Affirmed.

The appellant, Toledo Steamship Company, filed a libel in the District Court of the United States for the Western District of Michigan, against the steamer Saxona, and appurtenances, in a cause, civil and maritime, alleging a collision between the steamer Saxona and the steamer Eugene Zimmerman upon the waters of the St. Mary's river, whereby the steamer Eugene Zimmerman was so damaged that she immediately sank; setting forth also the various particulars in which the steamer Saxona was at fault, the cost of repairing the Eugene Zimmerman, and the loss of her use, and praying that process might issue against the Saxona and her appurtenances, that the court would be pleased to pronounce for libelant's demand, and that the Saxona might be condemned and sold to pay the same.

Zenith Steamship Company, a corporation, owner of the Saxona, filed its answer denying, among other things, liability, and setting forth matters in bar. It is these and their effect which are called into controversy; the case being heard on exceptions thereto. They are, quoting from the answer:

"(3) And your respondent says that on or about the 16th day of April, 1906, in the St. Mary's river, the said steamers Eugene Zimmerman and Saxona were in collision, as a result of which both of said steamers were damaged; that the damage to said steamer Saxona and to this respondent as her owner amounted to the sum of $34,051.56; that the said steamer Eugene Zimmerman was also damaged. And respondent says that the said libelant and this respondent did on the 26th day of October, 1906, for themselves as owners, for the insurers on their respective vessels and all parties interested through the said parties, enter into an agreement in writing by which they agreed to submit to the arbitration of Hermon A. Kelley and Harvey D. Goulder of Cleveland, Ohio, and William B. Cady, of Detroit, Mich., the question of fault for the collision referred to in said libel to be first determined, and also to determine the amount of damage as the case might require under their finding as to fault for said collision, said arbitration to proceed under the course and practice of such causes in admiralty, with right to apply the principle of division of damages obtaining in such courts in case of mutual fault, and further providing that all questions as to the time and place for hearing and the manner of taking proof and any and all questions of procedure not in said agreement specifically defined should be determined by said board of arbitrators, and the decision of any two thereof on any point of procedure or other matter arising was to be final and binding upon the parties, and the decision and determination as to fault and of the amount of damages due, as the case might require, was to be made in writing in quintuplicate, two copies thereof to be served upon the Toledo Steamship Company in care of Messrs. Hoyt, Dustin & Kelley of Cleveland, Ohio; and two copies upon the Zenith Steamship Company in care of Messrs. Goulder, Holding & Masten, of Cleveland, Ohio. A copy of said agreement is hereto attached marked 'Exhibit A.'

"This respondent says that in pursuance of said agreement the said board of arbitrators met, and on request of the parties as to the procedure to be followed said board by unanimous action, and in accordance with said agreement, determined that in conformity with the procedure and practice in admiralty they should first hear, try, and determine the question of fault

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

and liability, and, if counsel for the parties should not agree upon the items and amount of bills, this board would thereafter, in accordance with the procedure in admiralty and their agreement as to procedure so made, take such statements and testimony as might be necessary regarding the same and make such finding as to the amount of damages as the case might require, all which procedure and course was agreed to by the parties. And said board did, after such determination and agreement as to procedure and course, fully consider all of the testimony given by the parties and arguments of counsel for the respective parties and the briefs filed by counsel for the parties, and found and determined and awarded that the libelant's steamer, the Eugene Zimmerman, was solely at fault for said collision and resulting damage, and two of said arbitrators, to wit, William B. Cady and Harvey D. Goulder, did on the 16th day of March, 1908, communicate said finding and award in writing to the parties in the manner provided by said agreement and heretofore set out. A copy of said award of fault and liability for said collision is hereto attached marked 'Exhibit B.'

"Thereafter, to wit, on the 15th of April, 1908, after said award of fault and liability for said collision had been so determined and communicated in accordance with said agreement, the said the Toledo Steamship Company, libelant herein, served upon said arbitrators and respondent herein notice that it revoked the submission to arbitration of the controversy between that company, libelant, and respondent herein, arising out of the collision between the steamers Saxona and Zimmerman, which occurred in St. Mary's river April 16, 1906, and 'requested' that the arbitrators take no further action and hear no further evidence and make no award in the matter as said company, libelant herein, withdrew from further participation in the submission or hearing and declined to have anything more to do with it; a copy of said notice being hereto attached marked 'Exhibit C.'

"And respondent says that the insurers of said company's steamer Eugene Zimmerman who had the largest interest in said claim did not join in or authorize said alleged notice of revocation, and have and do repudiate the same and abide by and accept the award made under said agreement as aforesaid.

"Respondent says that said arbitrators having theretofore, under said agreement of arbitration and in pursuance of the procedure adopted by said board of arbitrators as authorized by said agreement of arbitration and the further agreement of said parties thereto at the time of submission, and in accord with the course and procedure obtaining in the admiralty in causes of collision, heard, considered, and determined the issue of fault and liability for the damage resulting from said collision submitted to them, and having communicated the award in writing to the parties, and counsel for the parties having failed to agree upon the amount of damage sustained by this respondent, for which libelant herein was answerable under the award as to liability theretofore made, by reason of the refusal of counsel for libelant to act further in the matter on account of said notice, two of said board, the third declining to act further by reason of said notice, did on July 1, 1908, after due notice to the parties and to the other arbitrator, and hearing and examination and consideration of proof offered, determine that the damages to this respondent for which libelant was answerable under the award on question of fault theretofore made and communicated, amounted to the sum of $34,051.56, which sum, with interest at the rate of 6 per cent. (6 per cent.) per annum from June 1, 1906, to the date of said award, to wit, July 1, 1908, amounting at said date to $38,307.80, on which interest was allowed from July 1, 1908, until the same should be paid, and did further fix and allow to this respondent, in accordance with the terms of said agreement, its costs, taxed as in courts of admiralty under said agreement, in the sum of $397.90; and did fix and determine the fees of the arbitrators at $3,000 and apportioned the same $1,500 to Mr. Cady and $750 each to the other arbitrators, together with their expenses. * * * A copy of said determination is hereto attached, marked 'Exhibit D.'

"And respondent says that the insurers on said steamer Eugene Zimmerman who had the greatest interest in the damage claim asserted by her own-

er, and were solely responsible for the damages sustained by this respondent, accepted said award and abide by the same.

"And your respondent says that said libelant by said agreement, the procedure therein authorized, duly adopted and acted upon, and by the finding and award as to fault under said agreement and the procedure adopted as therein authorized and agreed to by the parties, is estopped and concluded on the question of fault and liability for damages resulting from said collision, and by the finding and award as to the amount of damages, as aforesaid, is concluded and estopped as to the amount of damages due this respondent as a result of said collision. and is estopped and debarred from further proceedings on account of said collision or the damages resulting therefrom, and from maintaining this action.

"(4) Your respondent, on information and belief, says that at the time of said collision the said steamer Eugene Zimmerman was insured for the sum of $225,000 on an insurance valuation of $225,000 against the ordinary risks covered by maritime insurance and including liability for collision damage done to other vessels; that such insurance was intended to and did cover all and every part of the damage sustained by this respondent as owner of the steamer Saxona and all the damages sustained by said steamer Eugene Zimmerman and the owner thereof. excepting the item of loss of use claimed . to be about $38,000, and have paid to libelant its said damages excepting said claim for loss of use, and thereby became subrogated to all the balance of said claim embraced in said agreement and award and set up in the libel herein; that, in making said agreement of arbitration referred to, the said the Toledo Steamship Company was acting for and on behalf of said insurers; and that said insurers have accepted liability for the damages sustained in said collision in conformity with the award of said arbitrators, and abide by said agreement and the award so made, and have, your respondent is informed and believes, refused to permit the Toledo Steamship Company to make any claim for the damages sustained by the Zimmerman for which the said insurers have indemnified libelant."

The facts are so minutely detailed in the answer that the exhibits need not be set out at length. To this answer Toledo Steamship Company filed exceptions, of which the third raises all of the questions at issue. It reads:

"That all matters and allegations contained in the said answer in any way or in any manner referring to or alleging that the said steamer Zimmerman was insured, and that the matters in controversy in this cause were submitted to arbitration, are matters beside the issue, do not constitute a defense, and therefore are improperly pleaded in the answer of the said Zenith Steamship Company."

The Toledo Steamship Company filed an amendment to its libel which was also a reply to the answer, setting forth that the Saxona was insured against loss or damage done by her to another steamer and also against loss or damage sustained by the Saxona by reason of collision, in the sum of $190,000, and that the Zimmerman was similarly insured in the sum of $250,000 and showed that most of the insurance companies named were insurers of both vessels.

The amendment alleged also that the damage to the Zimmerman was the cost of raising and repairing her, and that the loss to the Toledo Steamship Company of the use of the Zimmerman was $37,000, and that the loss of the use of the Saxona was $8,337.42.

It was held in the District Court that the answer stated a defense to the libel. The exceptions were, accordingly, overruled, and the libel dismissed. Toledo Steamship Company appealed to this court.

Charles E. Kremer, for appellant.

Frank S. Masten and Tracy H. Duncan, for appellee.

Before WARRINGTON, Circuit Judge, and DENISON and HOLLISTER, District Judges.

HOLLISTER, District Judge (after stating the facts as above). The libelant bases its claim that the award is invalid on certain ancient rules of the common law that an arbitration may be revoked at any time before the award is made and published; that an award to be good must be final and must cover all of the subjects embraced in the submission; and that all of the arbitrators must join in it.

The law in its general application is not disputed, but the respondent contends that this particular arbitration was complete and final; that the revocation came too late; that the rights of the parties had become fixed by the award as to fault; that the function of the arbitrators with respect to the damages was ministerial and not judicial in character; that the duties of the arbitrators on that subject made them appraisers rather than technical arbitrators; that in any event the award as to fault was final on that subject; that the parties to the submission were acting not only for themselves, but expressly for the underwriters, cargo owners, and others in interest; and that therefore neither party could revoke the submission without the consent of the others jointly interested on the same side of the controversy.

In view of the conclusion we have reached, it is not necessary to determine the relation of the insurers and others in interest to the parties to the submission, or to decide the question whether either party could revoke without the consent of the others jointly interested on the same side, if indeed they were; for we are of opinion that, under the circumstances of this particular case, the attempted revocation of the submission was futile.

We are brought to this conclusion by a number of considerations, the chief of which is that justice and fair dealing between man and man require it.

Two steamships were in collision. To avoid going into court, the respective owners entered into an agreement for arbitration. The arbitrators and the respective counsel for the parties are all lawyers known to the court to be learned in the law of admiralty. There was only one real controversy. That was the question of fault. What the damages might be, while in one sense distinct from the question of fault, was necessarily incidental to that question, grew out of it, was dependent upon it, and followed it as a matter of course. The parties adopted the practice of admiralty courts in that it was agreed that the first question to be heard and determined was that of fault. So subordinate and incidental was the subject of damages that it was expected and intended that counsel, zealous as they are for the interests of their respective clients, would nevertheless agree upon the amount. It was only in event of their disagreement that the arbitrators would be called upon to take any further steps. The arbitrators met, counsel for the parties appeared, evidence on the subject of fault was submitted, and elaborate report was made in writing finding the Eugene Zimmerman at fault. The arbitrator for the Saxona concurred, but the arbitrator for the Eugene Zimmerman did not. It is clear that by this award the question actually in controversy between the parties was acted upon and decided in the manner the parties had agreed upon. About a month thereafter the defeated party attempted to re-

yoke the submission, repudiated it, and declined to have anything further to do with it. Counsel for the defeated owner, the appellant, by reason of its action made no attempt to agree with counsel for respondent, and for the same reason the arbitrator appointed by the defeated owner declined to go on with the submission. Thereupon the other two arbitrators, after notice to the parties and their counsel, and to the other arbitrator, proceeded to determine, and did determine, the amount of damage to which the owners of the Saxona were entitled.

It is to be gathered from the contract of submission and the subsequent agreements that the parties intended a bona fide determination of the question of fault and, as incidental thereto, the amount of damages the defeated party should pay. What kind of arbitration would it be, if each party, solemnly in writing pledging himself to its terms, could nevertheless destroy it by revocation after the real question in controversy were decided against him? If he could do this once, he could do it on resubmission, and, if on resubmission the question were decided the other way, the then defeated party might revoke.

The ethical impropriety of the defeated owner's revocation at such a stage in the proceedings is obvious and will not be sanctioned by a court except under the compulsion of rules of law clearly applicable.

Granting the rigidity of the rule at common law giving the right to revoke at any time before the final award is made, and that no award is final unless it embraces all of the subjects of submission, yet it may be said that the strictness of the rule grew out of the jealousy of the common-law judges in early times of their jurisdiction, and of their fear lest encroachments might be made upon it (Morse on Arbitration, 436), while in the modern view and practice the settlement of disputes by arbitration are encouraged by the courts; every reasonable intendment and presumption being in favor of their finality. Morse on Arbitration, 437; 3 Cyc. 586, 604.

The reason given for the rule is that:

"A man cannot by his act make such authority, power, or warrant not countermandable, which is by the law and of its own nature countermandable." Vynior's Case, 4 Coke (part 8) 302.

And hence he may revoke the power. This is a highly technical rule, and the enforcement of it against the purposes of parties who have sought a settlement of their disputes out of court by a tribunal of their own choosing has at times provoked protest from common-law judges.

In Mills v. Bayley, 2 H. & C. 36, 41, Baron Martin expressed his views as follows:

"I regret that the law is so, and that the Legislature, when they were dealing with the subject of arbitration, did not in all cases prohibit the revocation of references."

And in Northampton Gaslight Co. v. Parnell, 15 C. B. 630, 645, Maule, J., is reported to have said:

"The old rule upon which it was held that the power of an arbitrator was revocable was that a power not coupled with an interest was revocable—revocable by the authority which created it. From that rule it was inferred

—erroneously, as I think—that one of the parties to a submission might revoke without the other. It seems to me that was allowing one man to affect the interests of another. But it was an inveterate error."

In cases even at common law when the circumstances of the revocation were of such a character as to make the revocation unconscionable, the courts have held the rule of revocation inapplicable under the particular circumstances of the case.

Such a case was Mitchell v. Newman, 4 Penny. (Pa.) 443. The action was assumpsit. There was there an agreement of submission to arbitration by two partners of matters in dispute between them which contained, in addition to the submission, a stipulation that one partner should give to the other possession of the books and papers of the firm, and that the latter should become the liquidating partner with full power to dispose of its assets and pay its indebtedness therewith. Mitchell, having learned before the final meeting of the arbitrators that the award would be against him, gave notice of revocation. It was held first that the agreement was for something more than a mere submission, and that this was a sufficient consideration to make the submission irrevocable, and the court say:

"An attempted revocation just as the award is about to be announced, and when there is persuasive evidence that the party had substantial knowledge of the conclusion at which the referees had arrived, is not entitled to much favor. It cannot be asserted except under a clear claim of right. Such right did not exist in this case."

The same principle is involved in Carey v. Commissioners of Montgomery County, 19 Ohio, 245, and Commissioners of Montgomery County v. Carey, 1 Ohio St. 463. Carey and the commissioners submitted to arbitration all differences, damages, claims, and demands existing between them relating to the building of a courthouse. The arbitrators proceeded, made, and published their award in Carey's favor. Carey filed in court the award and arbitration bond and moved for judgment. The commissioners answered that they had prior to the making and publishing of the award revoked the submission. The Supreme Court of Ohio held that the commissioners had no right to revoke the submission after the arbitrators were sworn. In the first case the court, after referring to the rule in Ohio that the courts will adopt the principles of the common law as rules of decision, so far only as those principles are adapted to the circumstances, state of society, and form of government in Ohio, say that, pursuing the spirit of that rule and in their view of the whole subject, they would not adopt the common-law principle of revocation and allow it to operate upon arbitrations conducted under the statute, and further:

"But if the general right of revocation were to be acknowledged it might still be questioned, looking at all the facts and circumstances disclosed, whether it should be decided whether the defendants had, in this case, accomplished the revocation which they designed."

Now it is to be observed that the arbitration statute had no provision on the subject of revocation. This left that subject as open for consideration as it would be in case of submission not governed by statutory proceedings.

In the other case it was said:

"There the parties had fully and fairly submitted their controversy to arbitration under the statute, all the proofs and arguments had been fully and patiently heard, the deliberations of the arbitrators had been continued for nearly one month, and an award had been substantially agreed upon; and then the commissioners of the county were secretly informed by one of the arbitrators of the conclusions to which a majority of the board had arrived. A deed of revocation was made out by the commissioners, and placed in the hands of the auditor, who was not to serve the same, and did not serve it, until an attempt was made to induce the arbitrators to change the award, and until he was notified by the minority that they could not get the award to suit them.

"To allow a revocation by one party at such a time, and under such circumstances, instead of accomplishing the objects of an arbitration law, the speedy and final adjustment of the controversies of parties, by a tribunal amicably constituted for that purpose, would make it a mere means of mischief, trickery, and fraud."

These cases show an inclination on the part of the courts, even in common-law cases, to avoid the operation of this ancient rule of the common law.

Cases in equity have arisen in which the party seeking relief has been denied it because of the character of the revocation made by him.

In Morse v. Merest, 6 Madd. 26, the plaintiff and defendant had entered into a written agreement for sale by defendant to plaintiff of real estate at 25 years purchase at an annual value to be fixed by three persons, named in the agreement, on or before a certain day. The valuation had not been made because the defendant had prevented it. "The vice chancellor held that in the case of a reference time was essential in equity as at law; but that in equity a defendant was not permitted to set up a legal defense which grew out of his own misconduct." And it was decreed that the defendant should permit the valuation to be made, and, when made, a supplemental bill must be filed for specific performance.

Harcourt v. Ramsbottom, 1 Jac. & Walk. 505, 511, is a case in which one of the parties to a submission sought an injunction to restrain the exercise of a power of sale given to secure a balance to be ascertained by an arbitrator. The injunction was refused, although the award was made after the plaintiff had revoked the submission. The Lord Chancellor, Eldon, in refusing the injunction, said, among other things:

"It is said the award is not good because the authority was revoked. My answer is that, if it is revoked at law, I could not have considered it as revoked in equity, whether it was made a rule of court or not. If the award was not enforced, this court would leave the parties to deal with the matter at law; and, if at law you can restrain them from selling these estates, do it; but you have no equity to come here. Supposing the revocation to be good in law, this is a case in which a court of equity would not act. I am not saying it is good at law, but I agree entirely that it is bad in equity, under these circumstances."

The Lord Chancellor was of opinion that equity would not permit the party who had attempted to revoke the submission to have relief because he could not restore the parties to where they were before the submission was made, and therefore it was inequitable to permit the

plaintiff to proceed as if there had been no agreement of submission between him and the defendant.

Pope v. Lord Duncannon, 9 Sim. 177, 179, is much to the point. The defendants, the commissioners of woods and forests, were empowered by act of Parliament to purchase a wharf on the banks of the Thames to complete the site for the new Houses of Parliament. The commissioners agreed with the plaintiffs who owned the wharf for the purchase of it at a price to be fixed by three referees or any two of them. There was no provision that the submission should be made a rule of court. Before the referees had come to a decision the plaintiffs revoked the submission. The referee named by the plaintiffs withdrew, but the other two fixed the valuation. Thereupon the plaintiffs filed a bill to restrain the defendants from taking possession of the wharf and pulling down the buildings on it. It was held that equity would not restrain the defendants from acting on the award unless the plaintiffs had good grounds for revoking the submission. The vice chancellor said, among other things:

"I observe that, in Morse v Merest, Sir John Leach, Vice Chancellor, states that, in equity a defendant is not permitted to set up a legal defense which grows out of his own misconduct; so, varying the terms of the proposition, I say that a plaintiff is not at liberty to ask the aid of a court of equity in respect of an act done by him against good faith. And as, in this case, there is nothing whatever to show that the power which the plaintiffs had given to the arbitrators was revoked upon any just or reasonable grounds. I am bound to conclude that the revocation was a wanton and capricious exercise of authority on their parts, and, consequently, the motion (for an injunction) must be refused."

But this suit is in admiralty, a branch of the law not hampered by the rigid rules of the common law and which deals with causes upon considerations even more elastic than pertain to the broad jurisdiction of Courts of Chancery. In The Juliana, 2 Dods. Ad. 503, 521, it is said:

"A court of law works its way to short issues, and confines its views to them. A court of equity takes a more comprehensive view, and looks to every connected circumstance that ought to influence its determination upon the real justice of the case. This court certainly does not claim the character of a court of general equity, but it is bound, by its commission and constitution, to determine the cases submitted to its cognizance upon equitable principles, and according to the rules of natural justice."

It is said in The Harriett, 1 W. Robinson Ad. 183, 192, by Lushington, Judge of the High Court of Admiralty:

"If a court of equity would relieve, and a court of law could not, I consider that it would be my duty to afford that relief under the circumstances of the present case. The jurisdiction which I exercise is an equitable as well as a legal jurisdiction, and I must relieve the parties in this suit, if they are entitled to be relieved in law or in equity. It is therefore unnecessary for me to enter into a distinction whether the relief is at law or in equity."

Mr. Justice Story, in The Virgin, 8 Pet. 537, 549, 8 L. Ed. 1036, speaking of the considerations which control courts sitting in admiralty, says:

"Such courts in the exercise of their jurisdiction are not governed by the strict rules of the common law, but act upon enlarged principles of equity."

So broad are the powers of a court of admiralty, and so extensive the considerations which impel its action, that it has been called, as distinguished from a court of law or a court of equity, "a court of justice." Benedict's Admiralty, § 329.

The appellant invokes the aid of this court to fix the fault of the collision upon the respondent. He sets at naught, as if it never existed, the solemn agreement he made that the question of fault should be decided by arbitration. That question was settled against him by his own tribunal. He would have this court declare the arbitration a futility. If it is a futility it is only because he has made it so. He will not, in a court of admiralty, be permitted to take such advantage of his own wrong.

But if we are mistaken in this, and the submission is to be regarded as subject to revocation before final award, under the technical rules of the common law, we are of opinion that the award, as a common-law award, was final, and that, after the publishing of the conclusion as to fault, neither party could revoke. The reason for this lies in the character of the subjects submitted for determination. The question of fault necessarily involves the exercise of judicial functions, and lawyers learned in the law of admiralty were appropriately made the arbitrators to determine the question. The subject of damages, however, in this particular instance, required no exercise of such functions. What constituted the damages? In the one case the raising and repairing the Zimmerman and the loss of her use while out of commission; in the other, the cost of repairing the Saxona and the value of her use while out of commission. Herein what the parties intended by their agreement becomes of the first importance. It was agreed that, if counsel for the parties should not agree upon the "items and the amount of bills," the arbitrators would thereafter, in accordance with the procedure in admiralty, "take such statements and testimony as might be necessary regarding the same and make such finding as to the amount of damages as the case might require." Apparently the agreement contemplated only such damages as might be shown by the items and amounts of bills. What was contemplated by this language? Of course the cost of raising a vessel and the cost of her repair would be included in bills. It is well settled that the loss of the use of the vessel, "demurrage" as it is called, is also an element of damage. Cannon v. The Potomac, Fed. Cas. No. 2,386. Does this language include demurrage? If it does not, then presumptively the damages agreed to be considered would be ascertained by adding the bills together. If it does, then the proper amount of demurrage could be easily found by multiplying the average daily value of the use of the vessel, as presumptively shown by her books, by the number of days of detention. This is a proper way of dealing with the subject and involves no greater judicial function than the adding of the bills together.

In the case of Cannon v. The Potomac, supra, Mr. Justice Bradley said:

"The amount of damages allowed for the time the respective vessels were laid up seems to have been reached in a proper manner. The average net

earnings of the Lee for a certain period of time, embracing that of her detention for repairs caused by this collision, were taken as the basis for ascertaining the amount due to each trip, and the number of trips lost was a subject of very simple calculation."

It has been frequently decided that an agreement to submit to the decision of others a question involving only calculation or appraisement or the fixing of values, and the like, or something ministerial in character, does not constitute an arbitration under the strict rules of the common law. The distinction between the submission of such a question and one involving judicial functions is of vital importance, because the latter may be revoked at common law, while the former cannot be. So, in this case, while the submission might have been revoked before award as to fault, the agreement as to the method of ascertainment of damages could not be broken by either party, and, as the attempted revocation came after the award as to fault, the defeated party was bound to permit the submission to proceed and could not revoke as to damages.

In Mills v. Bayley, 2 H. & C. 36, there was an agreement between the parties covering two distinct things to be done. One was the emptying of the defendant's millpool upon the promise that the defendant should pay the plaintiff for every cubic yard of mud taken out of the pool, and that the admeasurement of the mud removed should be settled by a third person; and the other, that if any dispute arose it should be referred to him for decision. Plaintiff alleged that the defendant prevented him from completing the work by flooding the pool, and the matter was referred to the third person, who awarded the plaintiff a certain sum in respect to the quantity of mud then removed, and another sum in respect to damage occasioned by defendant's flooding the pool. The judges all agreed that the third person acted in the one instance as the measurer and certifier of the mud removed, in which character his authority was irrevocable, and in the other as an arbitrator for the settlement of any disputes which might arise between the parties, in which respect the arbitration was revocable.

In Palmer v. Clark, 106 Mass. 373, 389, it is said:

"A reference to a third person to fix by his judgment the price, quantity, or quality of material, to make an appraisement of property and the like, especially when such reference is one of the stipulations of a contract founded on other and good considerations, differs in many respects from an ordinary submission to arbitration. It is not revocable."

In Northampton Gaslight Company v. Parnell, 15 C. B. 630, an agreement had been entered into between the parties for the construction of a gas holder tank, and a bond was given for performance, in which it was agreed that, in case default should be made by the one who was to do the work in the completion of it within the time agreed upon, he should pay the other party such sum as damages as that party's engineer "should in his opinion adjudge to be reasonable and proper to be paid for such default," not to exceed a certain sum.

In an action for the sum found due by the engineer, the defendants pleaded in bar that before the decision of the engineer notice was given by the one who had undertaken the work and the other defendants,

his sureties, that they revoked the submission. The plea was held to be bad on the ground that the adjudication of the engineer was a mere appraisement and not an award. Maule, J., said:

"The duty imposed upon Mr. Eunson here was, not to determine whether or to what extent the covenants of the deed had been broken by John Parnell, but simply what sum would in his opinion be a reasonable compensation to the company, for John Parnell's default in the performance of the work. It was never intended to give him power to determine any matter in dispute between the company and John Parnell or the defendants. But, assuming a default to have been made, he is to ascertain or measure the amount of compensation."

In Locke v. Filley, 14 Hun (N. Y.) 139, it appears that a disagreement had arisen between partners who, in pursuance of the terms of their partnership agreement which provided:

"In case of any disagreement between the said parties as to any matter arising out of this agreement, the parties hereto agree to refer such and all matters of difference between them to the decision of three persons, one to be selected by each of the three said parties, the award of whom, or any two of them, shall be final,"

—entered into an agreement of dissolution, various differences having arisen, and provided that these should be submitted to the "arbitrament and award" of three persons named. Among other things, the agreement provided:

"In determining the matters so submitted, the arbitrators are to have submitted to them the articles of partnership executed between the partners, the partnership books, and any inventories, balance sheets and other statements appertaining to the partnership business, and also such books and papers of the former firms of John D. Locke & Co. as may be required in the premises, and may act upon their own judgment as to the values, or may take testimony, and after hearing the statements of the parties and their counsel, they shall make their determinations and award upon a full consideration of all the claims, questions and differences of and between the parties."

The submission appeared to be, and was held to be, made for the purpose of a full settlement of all questions between the parties connected with the partnership. It is said in the opinion of the court:

"When an award furnishes a substantial basis by and through which the parties can, by calculation or otherwise, work out the contemplated result, in accordance with the principles settled by and the rights of the parties declared in the award, it will be regarded sufficient."

And, when an award leaves nothing to be done to carry it into effect but ministerial acts of computation and measurement, it is not technically an arbitration. Parker v. Dorsey, 68 N. H. 181, 38 Atl. 785.

In James v. Schroeder, 61 Mich. 28, 27 N. W. 850, the parties to a suit entered into a written agreement for the settlement of the matters of difference, specifying fully the terms and conditions, and providing for an appraisal, by a third party and two other persons to be selected by him, of the value of a pier, the ownership of which was involved in the suit. Campbell, C. J., speaking for the court, said:

"This so-called reference was nothing more or less than an appraisal by appraisers on their own inspection, and, in our opinion, there was no occasion for the presence of any one else."

It appears in Atkinson v. Whitney, 67 Miss. 655, 7 South. 644, that, contemporaneously with the execution of a trust deed, the grantee agreed that in case of default he would prevent a sacrifice of the land by purchasing it at a valuation to be fixed by appraisers mutually chosen. This was held to be an appraisement; Wood, C. J., saying:

"Whatever are the rules governing submission to arbitration, this case can be no way affected thereby, inasmuch as this was in no proper sense an arbitration but simply an appraisement of the value of the lands by persons mutually selected for that purpose."

Norton v. Gale, 95 Ill. 533, 35 Am. Rep. 173, involved an agreement under a lease to pay rent yearly at 6 per cent. on the appraised value of the premises, to be ascertained by the selection of property holders. This was held to be an appraisement and not an arbitration.

In Green, etc., Ry. Co. v. Moore, 64 Pa. 79, a railway company accepted a charter on the condition that they should purchase, at the option of the owners, the horses, etc., of an omnibus line at a price to be assessed by appraisers. It was held that this was not an arbitration.

In Leeds v. Burrows, 12 East, 1, there was an agreement between an outgoing and an incoming tenant that the latter should buy the hay and spike-roll of the former upon the farm, and that the former should allow to the latter the expense of repairing the gates and fences of the farm, and that these questions should be settled by a third person. In the report of the case it is said:

"Leblanc, J., observed that it was only left to the persons to whom the matter was referred, to put a value upon the articles which the parties had already agreed should be paid for; and therefore it seemed more properly to be a valuation or appraisement than an award, within the meaning of the stamp acts."

There are many other cases of similar import, and the principle is supported by the great weight of authority.

There is also a class of cases analogous to the case under consideration in which fire insurance policies are involved, of which the Royal Insurance Company v. Ries, 80 Ohio St. 272, 88 N. E. 638, is an example. The second headnote, which in Ohio states the law of the case, reads:

"The provision in a standard insurance policy that: 'In the event of disagreement as to the amount of loss the same shall, as above provided, be ascertained by two competent and disinterested appraisers, the insured and this company each selecting one, and the other two so chosen shall first select a competent and disinterested umpire; the appraisers together shall then estimate and appraise the loss, stating separately sound value and damage, and, failing to agree, shall submit their differences to the umpire; and the award in writing of any two shall determine the amount of such loss; the parties thereto shall pay the appraiser respectively selected by them and shall bear equally all expenses of the appraiser and umpire'—is a provision for an appraisement and not for an arbitration, and such submission is not to be judged by the strict rules applicable to arbitration and award, and where the appraisers and umpire have before them a list of the property destroyed, and the insured's statement in detail in respect to his loss, it is not ground for setting aside the appraisement that they refuse to hear evidence.

" 'The distinction,' says Judge Summers, 'between an agreement for appraisement and an agreement to submit to arbitration, may not always be plain. But when the question of the liability of the company under the policy, and every other question, is reserved, and the only submission provided for is an appraisal of the property at and after the time of the fire to determine the single question of the amount of the loss, it would seem to be an agreement for an appraisement and not an arbitration.' "

It is to be borne in mind that the only subject actually in dispute between the parties was that of fault. At the time the agreement was made, there was no dispute on the question of damages, and there might never be any dispute. This is important in considering the nature of the submission as to damages because it has frequently been held that an arbitration, strictly speaking, has to do with the settlement of existing differences between parties. If there is no matter in dispute, there is no question to be arbitrated. The great weight of authority is in the affirmative of this proposition.

Bouvier adopts Worcester's definition of an arbitrator:

"A private extraordinary judge, to whose decision matters in controversy are referred by consent of the parties."

Mr. Justice Grier quotes Bouvier as reading:

"A private extraordinary judge chosen by the parties who have a matter in dispute, invested with authority to decide the same." Gordon v. U. S., 7 Wall. 188, 194, 19 L. Ed. 35.

In Memphis Trust Co. v. Brown-Ketchum Iron Works, 166 Fed. 402, 93 C. C. A. 166, Judge Knappen states the rule of revocation in this way:

"It is the rule that a naked executory agreement (not under authority of a statute or rule of court), made after the arising of a dispute, to submit the same to arbitration, is revocable at will by either party in advance of the actual carrying out of the agreement to arbitration and award therein."

In a note to Leeds v. Burrows, supra, Lord Ellenborough is reported to have said:

"That it was only appointing persons to settle an account of what was due between the parties for the value of the different articles. The parties had no contemplation of submitting any differences to the award of arbitrators, and no such terms ought to be imposed upon them against their own meaning and the meaning of the stamp acts."

In Collins v. Collins, 26 Beavan, 306, the parties had entered into a contract to purchase a brewery and plant at a price to be fixed by arbitrators who were to choose an umpire before entering upon the valuation. The arbitrators could not agree on an umpire, and it was held that the court had no authority under the arbitration acts to appoint an umpire for such a purpose. In reaching this conclusion it became necessary to determine whether the agreement was for an arbitration, strictly speaking. It was held that it was not; the Master of the Rolls saying with much else that was pertinent:

"An 'arbitration' is a reference to the decision of one or more persons, either with or without an umpire, of some matter or matters in difference between the parties. It is very true that in one sense it must be implied that, although there is no existing difference, still that a difference may

arise between the parties; yet I think the distinction between an existing difference and one which may arise is a material one, and one which has been properly relied upon in the case. If nothing has been said respecting the price by the vendor and purchaser between themselves, it can hardly be said that there is any difference between them. It might be that, if the purchaser knew the price required by the seller, there would be no difference, and that he would be willing to give it. It may well be that the decision of a particular valuer appointed might fix the price and might be equally satisfactory to both; so that it can hardly be said that there is a difference between them. * * * Undoubtedly, if two persons enter into an arrangement for the sale of any particular property, and try to settle the terms, but cannot agree, and after dispute and discussion respecting the price they say, 'we will refer this question of price to A. B.; he shall settle it'—and thereupon they agree that the matter shall be referred to his arbitration, that would appear to be an 'arbitration,' in the proper sense of the term. * * * It appears to me that the case of Leeds v. Burrows, draws the proper and fit distinction between an arbitration, in the proper sense of the term, and an appraisement or valuation, for valuation undoubtedly precludes differences, in the proper sense of the term; it prevents differences, and does not settle any which have arisen. That is the distinction which, in my opinion, exists between those cases of appraisement and those cases of arbitration."

It appears in Bos v. Helsham, L. R. 2 Exch. 72, that at a sale by auction one of the conditions was that if any mistakes were made in the description of any of the properties offered for sale, or if any error whatever appeared in the particulars of sale, such mistake or error should not annul the sale, but a compensation in such case should be given, to be settled by two referees, one to be appointed by either party to the sale, or an umpire.

The court could not distinguish the case from Collins v. Collins, supra; Pigott, B., saying:

"There is no matter in difference between these parties. This appears clear by noticing what it is which is meant to be referred, namely, the amount of compensation if there was any error. The language of the condition assumes that the parties are in agreement as to there being an error, and the only question remaining would be one of amount."

Many of the cases are reviewed in Norton v. Gale, 95 Ill. 533, 35 Am. Rep. 173. Mr. Justice Scholfield said in that case:

"There was, here, no matter in controversy when the leases were executed, or, for that matter, when the appraisers were selected, and the object was to preclude or prevent the arising of differences, and not to settle differences which had arisen."

In Green, etc., Ry. Co. v. Moore, supra, Sharswood, J., has much to say on the subject; among other things that:

"An award is the judgment of a tribunal selected by the parties to determine matters actually in variance between them—not merely to appraise and settle the price of property contracted for under the stipulation that this term of the contract was to be so ascertained. Had the parties made the contract, and afterwards, on a dispute arising, chosen arbitrators to determine what was due upon it, that might have been an award. The case is entirely different where the parties originally agree to buy and sell at a sum to be fixed by an appraisement to be made by a third person or persons."

He says further:

"It would not be necessary that the appraisers should decide upon evidence heard in the presence of the parties. They could decide, and indeed

would be expected to fix the value of the articles. upon their own knowledge of the subject, though doubtless they might seek information from other quarters."·

This language is particularly applicable because the arbitrators and counsel were experts in admiralty law; but, even if they were not, yet it was only probably necessary to call the custodian of the bills and of the books of the steamer found not to be in fault.

Strong analogy is presented by the case of Garr v. Gomez, 9 Wend. 649. Without setting forth the voluminous facts in the case, it will be sufficient for our purpose to say that it was there held:

"That there is a distinction between the reference of a collateral or incidental matter of appraisement or calculation, and the submission of matters in controversy for the purpose of a final determination; that the latter, and not the former, is a submission to arbitration."

In Cothran v. Knox, 13 S. C. 496, 507, it is said:

"As to the alleged arbitration, we think it lacks one essential feature, which deprives it of the character claimed for it. It seems to us to be essential to the very idea of an arbitration that there should have been an antecedent dispute or controversy between the parties."

But the character of the submission as to damages seems to us fixed by the Supreme Court of the United States in Kelly v. Crawford, 5 Wall. 785, 18 L. Ed. 562. There one party had been and was the agent of the other and had become indebted to the other. They agreed that an accountant should examine the books of account and ascertain from them the exact amount due; "the amount so found to be due and owing to be final." It was held that this agreement was not a "submission to arbitration," neither was the amount found to be due an "award" within the strict rules governing arbitrators and awards. In considering the nature of this agreement, Mr. Justice Field said:

"The principal objections urged for a reversal of the judgment rest upon the idea that the agreement of September 13, 1861, was a submission to arbitration, and the report or statement of Quigg was the award of an arbitrator, and that both are to be judged by the strict rules applicable to arbitrations and awards. This is, however, a mistaken view of the agreement and report. As observed by counsel, there was no dispute or controversy between the parties to be submitted to arbitration; nor was anything to be submitted to the judgment or discretion of Quigg. The books of account of the defendants were to determine the amount due; about these there was no controversy. The only duty of Quigg was to examine them as an accountant and to state what they exhibited."

And further:

"The object of submitting the books to him for examination was to ascertain the exact amount of the indebtedness of the defendants to the plaintiffs. For this purpose it was in his power to write up the books, to correct errors discovered, and make entries of what had been omitted by oversight or mistake. It is to be presumed that the parties desired to arrive at a just result, not to have a balance struck from the books without regard to their correctness."

The conclusion is that this agreement constituted an arbitration only on the subject of fault; that the revocation came too late, and the de-

feated party could not even at common law prevent the arbitrators from proceeding further to ascertain the amount the one at fault must pay. There would seem to be no reason why the parties should not include within the same agreement a subject for arbitration and a subject for appraisement, as was done in Mills v. Bayley, 2 H. & C. 36, 41.

Boston & L. R. Corp. v. Nashua & L. R. Corp., 139 Mass. 463, 31 N. E. 751, and Nashua & L. R. Corp. v. Boston & L. R. Corp., 157 Mass. 268, 31 N. E. 1060, which should be read together, are instructive on the point.

A. & B., each the owner of a railroad, had entered into a joint traffic agreement. "Disputes and differences had arisen between them concerning their rights under and growing out of the agreement," and the claims of each party against the other were submitted to arbitrators. Afterwards the parties agreed that certain claims of A. should be heard and determined first. On these claims the arbitrators made and published their award against A., who, thereupon, attempted to revoke the submission in toto. The effect of the two decisions is that A. was bound by the award on the claims submitted, but could revoke as to the other claims. That he could so revoke has no bearing on the propriety of our conclusion, for the other claims were all of the same character and quality as those upon which the award was taken. Each was entirely independent of the other, and in no way necessarily following the determination of any particular question to which it was incidental, and all were of a character to be the subject of arbitration, the question of appraisement or ascertainment of value or damage not being involved, and all of the questions submitted were in fact in dispute between the parties. But, even so, the award as to part of them was held to be a bar to an action on the claims arbitrated.

But it is urged by the appellant that, in any event, these arbitrators constituted a board of three, and that the questions were submitted to only two. Having found that revocation came too late in this particular case, we have no difficulty in holding that the proceedings cannot be made a futility for the reason of the failure of the appellant's arbitrator either to sign the award or to participate in the ascertainment of damages, when his failure was caused by the appellant himself, and due notice was given of the further proceedings. Under the circumstances, we have no doubt of the validity of the award or the propriety of the two arbitrators proceeding without the other to determine the damages.

The question was before the Justices of the King's Bench in the reign of James I. The action was debt upon an obligation conditioned to stand to the award of A., B., C., and D. of all actions and demands between the parties, "so as the said arbitrators, or any three or two of them, did make the said award under their hands and seals before such a day." It appeared that two of them made the award under their hands. "The question was whether this award by two is good (because the first part of the condition is that all the submission is to four, and not to three or two of them, which only comes under the 'so as'). And all the justices conceived it to be good enough." A writ of error was brought in the Exchequer Chamber; "but it was resolved to be

well enough, for the words subsequent explain it, that it may be made by two or three of them." Sallows v. Girling, 3 Cro. Jac. 277.

A few years later a similar case arose in the same court, Sir Edward Coke, Chief Justice. The defendant claimed the arbitrament to be void because it was not made by all of the four arbitrators. "The court at first inclined to that opinion; but, after several arguments at the bar, they all seriatim delivered their opinions that the arbitrament was good. * * * And they relied upon a former judgment in this court, betwixt Sallows and Carling." This judgment was affirmed in the Exchequer Chamber by all the judges and barons. Berry v. Penring, 3 Cro. Jac. 399.

In Dalling v. Matchett, Willes' Reports, 215, the submission was to three arbitrators, "so that they or any two of them might make an award." One did not attend, although he might have done so, and he had notice of the meeting. The other two arbitrators were held to have had authority to meet, hear, and award. "If," say the court, "either by obstinacy, or at the desire of the defendant, or being hindered by business, (the third arbitrator) absented himself from such meetings, having had due notice thereof, we are of opinion that the award is good."

The Court of Appeals of New York say on this subject:

"There can be no doubt that at common law, before the Revised Statutes, under such a submission, two arbitrators might lawfully meet and hear the proofs and allegations of the parties, where the third had notice and refused to attend and take part in the proceedings; and that an award made by the two who heard the matters submitted, under such circumstances, was a valid and binding award. This was settled in England at an early day, and upon full deliberation." Bulson v. Lohnes, 29 N. Y. 291, 293.

To the same effect are Goodman v. Sayers, 2 Jac. & Walk. 249, 261; Carpenter v. Wood, 1 Metc. (Mass.) 409; Crofoot v. Allen, 2 Wend. (N. Y.) 494; Kile v. Chapin, 9 Ind. 150; Doherty v. Doherty, 148 Mass. 367, 19 N. E. 352; Shores v. Bowen, 44 Mo. 396, 401; Mullins v. Arnold, 36 Tenn. 262, 266; Green v. Miller, 6 Johns. (N. Y.) 39, 41, 5 Am. Dec. 184.

The case of The Nineveh, Fed. Cas. No. 10,276, presents some features of resemblance to the case at bar, and is claimed by counsel for appellant to be exactly in point in his favor. An examination of it shows, however, a number of differences, and especially that the sole subject of the submission was the question of damages. The determination of that question involved, no doubt, a finding as to fault; but, if it did, the two questions were submitted as one, and the submission to three arbitrators was without express power to the majority to decide the dispute if the whole should be unable to agree.

From these considerations we are of opinion that the award as alleged in the answer is a complete bar to appellant's action, and that the exceptions to the answer should be overruled.

The judgment of the District Court overruling the exceptions and dismissing the libel is therefore affirmed.