## AMERICAN STEEL CO. v. GERMAN–AMERICAN FIRE INS. CO.

(Circuit Court of Appeals, Third Circuit. May 6, 1911.)

### No. 44.

Insurance (§ 574*)—Adjustment of Loss—Proceedings Under Provision for Appraisal.

A provision in an insurance policy that "in the event of disagreement as to the amount of loss the same shall * * * be ascertained by two competent and disinterested appraisers," the company and the insured each selecting one, is an agreement for an appraisement, and not an arbitration, subject to the strict rules governing arbitration and awards; and, there being no requirement for notice nor necessity for witnesses, an appraisement is not vitiated by the mere fact that the appraisers met without notice to the company, while officers of the insured corporation were present and pointed out the damaged property, where there is no suggestion of undue influence or bad faith, and the appraisers made their valuation on their own knowledge of the subject.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1430–1432; Dec. Dig. § 574.*]

Appeal from the Circuit Court of the United States for the Western District of Pennsylvania.

Suit in equity by the German-American Fire Insurance Company against the American Steel Company. Decree for complainant, and defendant appeals. Reversed.

McKenna & McKenna and Burleigh, Gray & Challener, for appellant.

David A. Reed (William S. Bryan, Jr., and Reed, Smith, Shaw & Beal, of counsel), for appellee.

Before BUFFINGTON and LANNING, Circuit Judges, and McPHERSON, District Judge.

BUFFINGTON, Circuit Judge. In the court below the German-American Fire Insurance Company, a corporation of Maryland, brought a bill in equity against the American Steel Company, a corporation of Pennsylvania, praying the latter be enjoined from prosecuting on the law side of that court a suit on an insurance policy. On final hearing the latter company was enjoined, and from a decree so ordering it took this appeal. The pertinent facts are as follows:

On January 1, 1909, certain ferro-manganese of the steel company was injured by fire while lying on a steamship dock in Baltimore. On

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

this ore the respondent insurance company had insured $15,000 and other companies $5,000. On January 14th the parties to this suit met in Baltimore; and, being unable to agree on the damage to the ore, each selected an appraiser in accordance with the policy which provided:

"In the event of disagreement as to the amount of loss, the same shall, as above provided, be ascertained by two competent and disinterested appraisers, the insured and this company each selecting one, and the two so chosen shall first select a competent and disinterested umpire. The appraisers together shall then estimate and appraise the loss, stating separate sound value and damage, and, failing to agree, shall submit their differences to the umpire; and the award in writing of any two shall determine the amount of such loss. The parties thereto shall pay the appraiser respectively selected by them and shall bear equally the expenses of the appraisal and umpire."

The Insurance Company named one Martin; the Steel Company, one Lavino. Ferro-manganese is not an ore which is kept in stock and sold as a general article of domestic commerce, but is imported on special order. Martin was an employé of the Maryland Steel Company, which has large works near Baltimore, and his name was given to the Insurance Company by the Maryland Company on the insurer's request for a man who was posted in reference to such ore. He was not known to the American Steel Company. An agreement for appraisement was then signed by the parties at the office of Bond, the Insurance Company's adjuster, and the appraisers then openly arranged to visit the scene of the fire that day. Later in the day the two appraisers went to the fire, and in their company were the officers of the Steel Company, who pointed out the insured ore. No one representing the Insurance Company was present at the dock. The testimony as to what was done at the dock by the Steel Company's officers was:

"We went around, sort of helping them as much as we could to get a look at this ferro. Some of it was covered over with tarpaulins, and I don't know what all else, and we just sort of looked around; that is all."

The appraisers examined the ferro and took samples, and then—

"got off by themselves and discussed the matter quite a good deal. You know we were not near them. Then we had some other ferro in other places, and we sort of walked around and considered whether we might be in danger on account of that."

This showing of the ferro to the appraisers was the only communication the Steel Company had with the appraisers, and the only questionable impropriety in that intercourse, if such there is, consisted in the fact that it was had in the absence of the Insurance Company. But that the appraisers, and especially Mr. Martin, were entirely free from any intentional misconduct, is shown by the fact that he subsequently went alone to consult the Insurance Company. Of this Mr. Bond says:

"These gentlemen met and were in my office together, and they agreed on an umpire in a few minutes. They went out, and I did not see anything more of Mr. Lavino. A few days afterward Mr. Martin came in and asked me about the weighing of this ferro-manganese. I told him that it had been agreed with Mr. Cottman to weigh it; but, I said, 'I suppose the other appraiser will have to be here when that is done.' 'Oh,' he said, 'no, he has

practically left the whole thing in my hands, and I am going to attend to it.' So I gave Mr. Cottman an order to weigh the ferro-manganese, and a copy of the weight was sent to Mr. Martin by Mr. Cottman. I paid the expense of weighing it, and sent the bill to the American Steel Company, and they sent me a check for it, and it was charged in the loss."

Mr. Martin also made an analysis of the ferro, and on January 20, 1909, he and Lavino joined in a written appraisers' valuation thereof at $15 per ton. At that date the market value of undamaged ferro was. $55 per ton. Their award was duly reported to the Steel and Insurance Companies, and on January 28th the latter notified the former that:

"The ferro-manganese appraised is absolutely your property, subject, so far as the insurance companies are concerned, to your disposal, and that, the loss having been settled by appraisal, the companies hold themselves liable for the amount of the award, together with such expenses as have been incurred in the salvage of the metal. * * * Award having been made on 'duty paid' basis, any abatement of duty allowed by the Gov't is, of course, to be deducted."

In April following the Steel Company made proofs of loss on the basis of the value fixed by the award. The loss not having been paid, the Steel Company on July 13th brought suit on its policies. Thereupon the Insurance Company filed this bill to enjoin the action at law.

From the testimony it now appears that, subsequent to the appraisement and the declination of the Insurance Company to take the ferro at the appraised price, as it was entitled to do under the policy, the Maryland Steel Company, after inquiry by telephone, made through Martin and by letter through its other officers, purchased the salvage ferro from the American Steel Company at $25 per ton. The proofs disclose nowhere any evidence of bad faith on the part of the respondent. The award seems to have been made in good faith. Both the weighing and the analysis were by the appraiser selected by the Insurance Company, and the insured were not even acquainted with him. He was called as a witness; but no examination or criticism was then, or is now, made as to the accuracy of either. No suggestion is made of any object he would have in making a low valuation on this ore. The subsequent offer of a higher price by his company for the ferro is not indicative of bad faith. Had the Insurance Company elected to take this salvage, and subsequently sold it to Mr. Martin's employer at an advance, the insured on this ground alone could not have repudiated the appraisal. Indeed, this is virtually conceded, since the case finally settled down to the contention here made, and adopted by the court below, as stated in its opinion, that:

"With respect to the valuation made in the award, and the subsequent sale, the parties connected therewith may have acted in entire good faith, so far as may be necessary for the decision of this case. The plaintiff is entitled to the relief prayed for, for the reason that the arbitrators met with the officers of the defendant company in the absence of the complainant's representative, and without notice to the complainant."

That conclusion was based on Lutz v. Linthicum, 8 Pet. 165, 8 L. Ed. 904, where it was said:

"Without question, due notice should be given to the parties of the time and place of hearing the cause; and, if the award was made without such notice, it ought, upon the plainest principles of justice, to be set aside."

But this was said in reference to an arbitration, which involved the whole controversy in a pending law action and the question of the defendant's liability. The present was a mere case of valuation. Liability for the loss was conceded, and the clause in question was simply to appraise loss, in this case by appraising the salvage. This provision, which is the form used in the standard statutory policy of many states, was considered by the Supreme Court of Ohio in Royal Company v. Ries, 80 Ohio St. 272, 88 N. E. 638, and it was there said:

"The distinction between an agreement for appraisement and an agreement to submit to arbitration may not always be plain. But when the question of the liability of the company under the policy, and every other question is reserved, and the only submission provided for is an appraisal of the property at and after the time of the fire, to determine the single question of the amount of the loss, it would seem to be an agreement for an appraisement, and not an arbitration."

This view has the support of authority. Parker v. Dorsey, 68 N. H. 181, 38 Atl. 785; Russell on Arbitration, 44, 191; Atkinson v. Whitney, 67 Miss. 655, 7 South. 644; Norton v. Gale, 95 Ill. 533, 35 Am. Rep. 173; Green Ry. Co. v. Moore, 64 Pa. 79; Leeds v. Burrows, 12 East, 1; Bos v. Helsham, L. R. 2 Exch. 72; and Toledo Co. v. Zenith Co. (C. C. A.) 184 Fed. 401, where, after a most thorough discussion of the authorities, it was said:

"It has been frequently decided that an agreement to submit to the decision of others a question involving only calculation, or appraisement, or the fixing of values, and the like, or something ministerial in character, does not constitute an arbitration under the strict rules of the common law. The distinction between the submission of such a question and one involving judicial functions is of vital importance, because the latter may be revoked at common law, while the former cannot be."

Being a mere appraisement, and there being nothing in the agreement which made witnesses or notice requisite, the presence of the parties, notice, and the giving of testimony were not necessary. Atkinson v. Whitney, supra; Norton v. Gale, supra; James v. Shroeder, 61 Mich. 28, 27 N. W. 850; Green v. Moore, supra, where, speaking of an appraisement as contrasted with an arbitration, the Supreme Court of Pennsylvania say:

"Nor is such an appraisement subject to strict rules governing arbitrations and awards. Kelly v. Crawford, 5 Wall. 785, 18 L. Ed. 562. It would not be necessary that the appraisers should decide upon evidence heard in the presence of the parties. They could decide, and, indeed, would be expected to fix the value of the articles, upon their own knowledge of the subject, though doubtless they might seek information from other quarters."

Finding nothing in the case to challenge the good faith of the appraisers, and being of opinion that their valuation was a mere appraisement, and not an award of arbitrators, we hold that no sufficient grounds have been established by the proofs to warrant the setting aside of their appraisement.

The decree of the court is therefore reversed, and the case remanded, with directions to dismiss the bill, at the cost of the complainant herein.